IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THE DOW CHEMICAL COMPANY,

                Plaintiff,

    v.

BOB R. MAUGHON,

                Defendant.

Case No. _____

## VERIFIED COMPLAINT

Plaintiff The Dow Chemical Company ("Dow"), for its Verified Complaint against Defendant Bob R. Maughon ("Maughon"), alleges as follows:

### INTRODUCTION

1.    Maughon, and in particular, his work for Dow over the past two decades and his departure to a key competitor, presents the prototypical case for the enforcement of a non-compete agreement.

2.    Saudi Basic Industries Corporation ("SABIC"), like Dow, is one of the world's largest chemical companies.  SABIC's public statements and its business initiatives over the last decade make clear that SABIC's business model has evolved to mirror Dow's in many key areas, including Dow's large and profitable businesses such as polyethylene.  In fact, SABIC has specifically targeted areas that directly compete with Dow in chemicals, plastics, and numerous other business initiatives.

1

732375344.4

To say that SABIC and Dow are direct competitors is a significant understatement.

3.      By hiring Maughon, SABIC has demonstrated that it no longer wants to compete simply on a product versus product or technology versus technology basis. Rather, SABIC has attempted to unfairly tip the competitive scales greatly in its favor by poaching a senior-level employee with direct access to Dow's most sensitive technology, business strategy and operational details.

4.      In Maughon, Dow has found the perfect employee to have a dramatic competitive impact. Simply put, Maughon knows Dow's entire playbook. He is a high-ranking Research & Development ("R&D") executive who, in more than 21 years with Dow, learned and developed intimate knowledge about Dow's most sensitive trade secrets and highly proprietary information, such as its past, current and future plans with respect to technologies, R&D projects and innovations, sustainability programs, third party collaborations, and investment and development objectives. During the last five and a half years of his employment at Dow, Maughon worked as Dow's R&D Vice President for Packaging & Specialty Plastics and Hydrocarbons. Significantly, he also concurrently held key positions on three high-ranking leadership teams: Maughon served on both Dow's company-wide Global Leadership Team ("GLT") and the GLT for Packaging & Specialty Plastics ("P&SP"), the largest component of Dow's business, as well as Dow's R&D Leadership Team. He also served as a Director and the President of Dow

2

International Technology Corporation, a wholly-owned subsidiary of Dow.

5.      As a member of these Global Leadership and R&D Teams, Maughon not only had deep familiarity with Dow's company-wide technology and R&D programs, but he also was instrumental in developing the company's key business strategy initiatives and plans, capital investment decisions and objectives, and he had access to Dow's operational and economic strategies and data, profit margins with respect to products, customers and markets, and other highly confidential information regarding many critical facets of Dow's business which conflict with SABIC's strategic product initiative investments.

6.      Maughon thus presents the perfect storm for Dow from a competitive perspective.  He possesses the unique combination of having in-depth technical knowledge about Dow's technologies and R&D and, on a broader level, was an active participant in Dow's leadership teams regarding go-to-market strategies and competitive benchmarking, and how all of these points fit within Dow's overall business strategies, including its customized strategies for each particular geographic area.  This capability can drastically shorten SABIC's investment strategy by eliminating decades of trial and error.

7.      Maughon knows much more than just what Dow has done well and what it plans to do going forward.  He also knows what products Dow has chosen not to make; technologies, processes and products in which Dow has chosen not to

732375344.4

invest; markets that Dow has decided not to enter; constraints on Dow's intellectual property; and other operational, financial and manufacturing strategies that Dow has declined to pursue. As to all of these issues, Maughon knows why Dow has declined to become involved and what impediments exist for Dow, and participated in competitive intelligence at Dow with respect to SABIC and other competitors. This too provides enormously valuable intelligence and insight to SABIC at Dow's expense.

8.      And Maughon's familiarity with the economics of important Dow relationships with customers, collaborators, and suppliers (including certain relationships between Dow and SABIC) presents yet another tremendous competitive threat to Dow.

9.      Maughon voluntarily resigned his employment with Dow effective April 18, 2019. He provided less than one week of notice of that departure, leaving insufficient time to properly transition his substantial job responsibilities to others at Dow. Further, Maughon was reluctant to tell Dow who his new employer would be. Despite having signed a binding employment agreement with Dow that contains a reasonable non-compete restriction, Maughon began working just a few days later as a high-ranking executive of SABIC.

10.     SABIC competes directly with Dow on a global basis in numerous markets and products, including chemicals and plastics. Maughon's role at SABIC

as Executive Vice President of Technology, Innovation and Sustainability, and Chief Technology and Sustainability Officer directly mirrors much of his core function over the last several years at Dow.  Thus, Dow is faced with a long-tenured, senior management employee with an avalanche of knowledge of Dow's confidential and most sensitive technology, R&D and sustainability initiatives, business strategy, key economic drivers, operational information, and other trade secrets and proprietary information—much of which he developed at Dow's significant expense—who has jumped ship to join one of Dow's largest direct competitors in the very same businesses.  This detailed knowledge will provide immediate benefits to SABIC in all aspects of its current and near-future strategy.

11.    Dow therefore brings this action to enjoin Maughon from unfairly competing with Dow, and improperly using or disclosing, Dow's confidential and proprietary information, in breach of his contractual and statutory obligations to Dow.  The fundamental issue in this case is straightforward:  Dow and Maughon entered into a binding contract with a reasonable non-compete restriction that Maughon plainly breached by accepting employment as a "C-suite" executive with SABIC.

12.    Maughon's and SABIC's thinly-veiled assurances that they will protect Dow's confidential information ring hollow in light of SABIC's competitive efforts to mirror Dow's business in recent years, and, in any event, are beside the point.  The

732375344.4

Agreement specifically addresses confidential information in a separate provision. No provision of the Agreement permits (or excuses) a breach by Maughon of his non-compete obligations simply because Maughon (or his new employer) promises not to disclose or use confidential information.  In fact, the Agreement was specifically designed to contain non-compete provisions preventing Maughon from joining a competitor for a period of two years, and separately, provisions to prevent the use or disclosure of confidential information indefinitely.

13.    Maughon's and SABIC's notion that mere promises to honor confidentiality obligations are sufficient ignores the practical reality that Maughon fulfilling that promise in the exercise of his new job is impossible, given what is in Maughon's head and the direct competitive overlap between Dow and SABIC. Further, Maughon and SABIC completely disregard the non-compete provisions in the Agreement.  Dow does not have to hope that Maughon and SABIC honor his confidentiality obligations, wait to determine whether it can figure out how those obligations were breached, and try to prove exactly how and why that happened. The Agreement Maughon executed expressly eliminates those concerns with a reasonable non-compete provision that precludes employment with SABIC.

14.    Indeed, if Dow cannot enforce its non-compete provision with a high-ranking executive like Maughon, given the access he has had at Dow and the tremendous competitive harm to Dow he is likely to accomplish, then the Michigan

6

legislature's enactment of Section 445.774a of the Michigan Antitrust Reform Act (MCL § 445.774a) serves little purpose.  That statute specifically authorizes judicial enforcement of reasonable non-compete covenants between employers and employees, just like those in Maughon's Agreement.

## PARTIES

15.     Dow is a Delaware corporation with its principal place of business in Midland, Michigan.

16.     Defendant Maughon, on information and belief, obtained a Bachelor's degree in Chemistry from Rice University in 1993 and a Ph.D. in Organic Chemistry from CalTech, the California Institute of Technology, in 1998.

17.     Maughon began working for Dow at its headquarters in Midland, Michigan in January 1998.  He continued working in Michigan for more than 19 years.  On or about July 1, 2017, Maughon continued working for Dow in Texas, where he was based until he resigned in April 2019.  Upon information and belief, Maughon resides in or around Houston, Texas.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this Court has diversity jurisdiction over the claims in this case.  For purposes of diversity jurisdiction, Dow is a citizen of Delaware and Michigan, and Maughon is a citizen of Texas.  Accordingly, the parties are of diverse citizenship.

732375344.4

19.     Furthermore, the amount in controversy exceeds $75,000.  "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."  *Cleveland Housing Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 560 (6th Cir. 2010) (citation omitted).  "A complaint may reach the jurisdictional amount by including claims for losses that are difficult to quantify, such as competitive losses."  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir. 1992).  "It is generally agreed in this circuit, that the amount in controversy should be determined 'from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect."  *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 407 (6th Cir. 2007) (citation omitted).  Here, Dow seeks to enjoin Maughon's employment with SABIC for a period of two years from the date of entry of the injunction.  The value to Dow to protect its confidential information and trade secrets far exceeds $75,000.  Further, on information and belief, Maughon's compensation at SABIC will substantially exceed $75,000, in part because Maughon's compensation at Dow was much higher than that amount.

20.     Maughon is subject to personal jurisdiction in Michigan because, among other reasons, he breached the terms of his employment contract, which involves a Michigan-based business relationship.  Maughon executed the Agreement in Michigan, performed most of his services for Dow in Michigan, learned and

developed substantial amounts of the confidential information in Michigan, developed much of the expertise and specialized knowledge that will enable SABIC to directly compete with Dow in Michigan, and continued to interact regularly with Dow's headquarters in Michigan while residing in Texas.  In fact, Maughon's job function continued to be based in Midland even after Maughon relocated to Texas. Maughon's move to Texas occurred only because Dow accommodated his request to relocate to Texas in 2017, and did so at Dow's expense.  Indeed, between the time that Maughon began working for Dow in Texas in July 2017 and his resignation fewer than two years later, Maughon flew to Michigan for Dow-related business approximately 20 separate times, *i.e.*, about once each month.

21.     Venue is proper in this district as to all claims pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dow's claims occurred in the Eastern District of Michigan, and, moreover, Maughon obtained and helped develop, in Michigan, a substantial part of the confidential information that he possesses.  Dow retains such information in Michigan as well.

## FACTUAL BACKGROUND

### A.     <u>Summary of Maughon's Employment with Dow</u>

22.     Maughon worked primarily in Dow's P&SP business, which comprises the largest portion of Dow's portfolio and accounts for approximately $22 billion in annual revenue.  As detailed below, over the course of his 21-year career at Dow,

732375344.4

Maughon steadily rose through the ranks, ultimately becoming R&D Vice President for Packaging & Specialty Plastics and Hydrocarbons—a role that provided him with virtually unlimited access to Dow's confidential information concerning all things plastics.  As Maughon well knows, Dow has chosen not to patent many processes and technologies in which he was directly involved because they are trade secrets and highly proprietary.

23.    In addition to his role on the R&D Leadership Team, Maughon also served as a member of both the Global Leadership Team for the P&SP and Hydrocarbons business and the company-wide Global Leadership Team reserved for the top leadership across Dow.  Maughon can "connect the dots" on all P&SP technologies through the entire life cycle of the product, from the initial development of molecules and related technologies to the commercialization and marketing of those technologies.  Maughon also served, for several years leading up to his resignation, as a Director and the President of Dow International Technology Corporation.  While employed at Dow, he also formerly served as a Director of Union Carbide Polyolefins Development Company, Inc.

**B.    Maughon's Employment Agreement with Dow**

24.    Because Maughon would have access to and was expected to use confidential information to perform his duties, Dow required him to sign an Employment Agreement ("Agreement") as a condition of joining the company in

10

1998.  A copy of the Agreement is attached as Exhibit 1.

25.    Maughon signed the Agreement on January 19, 1998, in consideration and as a condition of his employment by Dow, "the salary or wages, salary increases and promotions and other benefits received by [him] during such employment," and "in consideration of being given access to confidential information." *Id.* at p. 1. When Maughon signed the Agreement, he was living in Midland, Michigan, where Dow is headquartered.  Maughon attested under oath to his residence in Michigan on the Employment Eligibility Verification Form that he also signed on January 19, 1998.

26.    Importantly, the Agreement contained a reasonable non-compete provision.  Article 6 of the Agreement requires that, for a period of two years after termination of his employment with Dow, Maughon cannot work for a competitor of Dow in certain businesses and areas of technology.  Specifically, Article 6 contains the following limited set of restrictions on Maughon's ability to work for a competitor:

> I agree that for a period of two (2) years from the date of the termination of my employment with Dow, I will not participate, or have any interest, directly or indirectly, in any business which involves an area of technology or business in which I worked for Dow during the last five (5) years of my employment at Dow and in which I was exposed to any Confidential Information of Dow.  I further agree that for such period, I will not interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, with respect to the business carried on by Dow with any other party.  The restriction of this Article shall apply to any area of the United States, or any other country of the

world in which Dow is conducting such business or may be reasonably expected to engage in any such business within that two (2) year period. Such restriction shall apply to me, as owner, partner, officer, employee, consultant, or advisor.  For purposes of this paragraph, ownership of not more than one percent of the common or preferred stock of any publicly held company whose stock is listed on any recognized stock exchange or trade over the counter shall be disregarded.

*Id.* at p. 2, Art. 6.

27.    In Article 2 of the Agreement, Maughon separately agreed to the

following confidentiality provision:

I agree that I will not disclose to anyone or use, directly or indirectly, either during or after my employment, any Confidential Information of Dow, except with the written consent of Dow or as required in my duties as an employee of Dow.  This obligation shall continue until such Confidential Information becomes generally known to the public without participation on my part.

*Id.*, at p. 1, Art. 2.

28.    Article 2 of the Agreement also includes a detailed definition of

confidential information:

Dow has defined Confidential Information to mean trade secrets, know-how, and other information, not generally known, relating to Dow's business which is disclosed to you or with which you become familiar during your term of employment with Dow. Confidential Information includes information relating to Dow's business practices and prospective business interests, including, but not limited to, customer lists, forecasts, business and strategic plans, financial and sales information, products, processes, equipment, manufacturing operations, marketing programs, research, product development, engineering, computer systems and software and personnel records.

*Id.*

732375344.4

29.     During his employment with Dow, Maughon also periodically received perquisites such as Long-Term Incentive ("LTI") awards in the form of stock options and restricted stock units.  In order to be eligible for those awards, Dow required Maughon, like all other eligible employees, to agree to the terms and conditions in each of Dow's Stock Option Agreement ("SOA") and Restricted Stock Unit Agreement ("RSUA").

30.     Section 3 of the SOA states that the SOA "shall terminate and any vested or unvested portion of the Option shall be forfeited if your employment with any member of the Company Group is terminated for any reason other than death, disability, retirement or Special Separation Situation."  Section 4 of the RSUA contains a similar provision.

31.     Section 7 of the SOA provides:  "If (a) you exercise any portion of the Option prior to the expiration date of the Option, and (b) you leave the employment of a member of the Company Group within one year after such exercise for any reason except death, disability or retirement, then you shall pay to the Company any excess of the Fair Market Value on the date of exercise over the exercise price."

32.     Section 10 of the SOA states that "if at any time within three years after you exercise any portion of this Option you engage in any act of Unfair Competition, you shall promptly pay to the Company any excess of the Fair Market Value on the date of exercise over the exercise price."  The SOA specifically defines "Unfair

13

Competition" to include, among other things, "your acceptance of employment with an employer that is in competition with the Company."  Section 11 of the RSUA includes nearly identical language.

### C.    Maughon's Ascension Through the Ranks at Dow

33.    In January 1998, Maughon started working for Dow's Core R&D department in Midland, Michigan.  For the first 19 years at the company—from January 1998 until July 2017—Maughon worked at Dow's facilities in Midland, Michigan.  In July 2017, Maughon moved to Dow's Freeport, Texas facility, where he worked until he resigned in April 2019.

34.    During his 21-year tenure at Dow, the company promoted Maughon at least eight times to a series of increasingly important positions.  In 2004, for example, Dow promoted him to a position in which he assumed leadership for the chemical feedstocks research area, focusing on breakthrough technologies for utilization of methane and coal as Dow feedstocks for olefins.

35.    Dow promoted Maughon again in 2005 to Technical Leader for the Core R&D Catalytic Chemistry group.  Then, in 2006, Dow named Maughon as the Director of Inorganic Chemistry and Catalysis, where he was responsible for leading inorganic chemistry, homogeneous and heterogeneous catalysis, and high-throughput research with responsibilities for the development of new technologies for chemical and renewable feedstocks and advantaged catalytic processes.

14

36.     In 2008, Dow again promoted Maughon to Lead R&D Director for the Hydrocarbons and Energy Business.  In that role, Maughon was responsible for, among other things, developing and executing organizational and business strategy, intellectual capital management, employee pipeline development and hiring, and identification and execution of external partnerships.  Maughon also had project portfolio responsibilities covering alternative feedstocks (chemical and renewable), support for olefin cracker processes globally, and next generation olefin process development.  A cracker is a chemical complex where feedstocks are converted to several products, such as ethylene and propylene, among others.

37.     In 2010, Dow named Maughon as Lead R&D Director for Dow Wolff Cellulosics, where, in addition to developing and executing organizational and business strategies, Maughon's key responsibilities included a project portfolio covering cellulosic ether and polyethylene oxide process and product development, and market-facing application development research and development in the Pharmaceuticals, Food & Nutrition, and Industrial Specialties segments.  Dow promoted Maughon again in 2012 to Senior R&D Director for Dow Wolff Cellulosics.

38.     In August 2013, Dow promoted Maughon to became Dow's Global R&D Director for Olefins, Aromatics and Alternatives; Feedstocks and Risk Management; Packaging and Specialty Plastics; and Elastomers, Electrical and

Telecommunications.  He added the title of R&D Vice President for Packaging & Special Plastics and Hydrocarbons in October 2014, and held both roles for several years until he resigned in April 2019.  In these two roles in particular, Maughon's responsibilities included developing organizational and business strategy and executing on that strategy.  These roles also gave Maughon extensive responsibilities and oversight in many important areas of Dow's business.  For example, Maughon's key responsibilities included employee pipeline development and performance management, hiring and intellectual capital management.  His project portfolio as Global R&D Director covered alternative feedstocks (chemical and renewable), support for olefin cracker processes globally (an asset base that, by itself, exceeded $15 billion), next generation olefin process development, polyolefin process, catalysis, material science, characterization technology, and application development across polyethylene and specialty plastics, adhesives and functional polymers, packaging, elastomers, and electrical and telecommunications segments.

39.   In the course of his decades-long employment with Dow, and particularly in his increasingly senior management roles and his service on two separate Global Leadership Teams as well as the R&D Leadership Team, Maughon was privy to and often directly developed and produced confidential, proprietary, and otherwise private information concerning Dow's products, technologies, processes, geographies, and strategies in a variety of areas—including R&D,

732375344.4

financial, marketing, human resources, compensation and benefits, promotions, and sales.  Maughon also produced and learned confidential information regarding Dow's product and processes innovation and strategic investment in critical areas, such as polyethylene, specialty plastics, elastomers, olefins, aromatics, and alternative routes to feedstocks.  Indeed, Maughon himself was responsible for developing many of Dow's strategies in these areas.  In short, during his employment at Dow, Maughon was directly responsible for defining and developing Dow's competitive advantage in critical technology areas, had awareness and respected influence over all of Dow's technology areas, and had complete access to virtually all confidential information regarding Dow's global R&D.

**D.    Maughon Possesses an Avalanche of Dow's Trade Secrets and Confidential Information, Including as to Sustainability**

40.    Although Maughon produced, developed and learned highly confidential information about Dow throughout his employment, the last five and a half years of his employment at Dow were particularly noteworthy in that regard, as Maughon served on both Dow's company-wide GLT as well as the GLT for P&SP and Hydrocarbons.  In those roles, Maughon had direct access to highly confidential information about both the P&SP and hydrocarbons business, and the company's corporate strategy.

41.    P&SP has three primary segments:  (1) hydrocarbons, such as olefins and aromatics; (2) functional polymers and specialty resins (such as adhesives and

17

elastomers) and (3) polyethylene.  Those roles provided Maughon with substantial highly confidential and proprietary information about Dow's operations, strategies and finances.  Maughon attended quarterly P&SP GLT meetings and frequently prepared and presented substantial confidential information (typically marked "Dow Confidential – Do not share without permission") at some of those meetings.

42.     An illustrative example is a lengthy, June 2018 slide presentation that Maughon co-presented to the P&SP GLT.  The highly proprietary presentation included, among other things:   detailed information about Dow's return on investment data; EBITDA numbers; profit margins; strengths and opportunities to advance Dow's leadership positions in sustainability, innovative process technology and advancing tools like high throughput, modeling, automation and digitization; talent pipelines with targeted development programs; innovation synergies "in the works"; solution processes and improvement opportunities; new catalyst implementations; key questions on sustainability and plastics recycling, the answers to which "will drive strategy and tactics."  Maughon's presentation also included a slide entitled "The Future of Olefins at Dow – Cracker of the Future" that outlined how Dow's in-development, proprietary methodologies "have the potential to create a unique solution."  Through his slides, Maughon laid out Dow's comprehensive strategic plans for a product with which SABIC directly competes.

43.     Sustainability and recycling also comprised a significant portion of the

presentation to the GLT of P&SP.  Maughon's slide entitled "Plastics Sustainability Summit:  R&D Action Plan" identified specific ways in which Dow's R&D team would investigate better management of plastic waste, including specific process and design solution changes.  The sustainability presentation included Dow's expected costs in 2019 and capital anticipated for future years.  The sustainability slides also discussed Dow's "Sustainable Products Solution" and Dow's goals and approach to accelerate ongoing efforts, including Dow's "unique materials portfolio and expertise" to achieve those goals.  The strategic management of complex issues like sustainability and recycling are largely viewed as critical for Dow's future.

44.    Maughon's sustainability slides also addressed Dow's specific recycling "pilot" approach and goals with regard to mechanical sorting and recycling, including the design of a new recovery and processing facility for flexible packaging.  Maughon's slides included discussion of why Dow was well-positioned to address the issues, its specific capital resource needs, necessary headcount commitments, and other elements that would be "critical to success."  Further, Maughon's slides identified "critical enablers" for chemical recycling and various benefits and alternatives, and selection criteria for waste plastics.

45.    In addition to sustainability, Maughon's slides addressed how various forms of automation could drive efficiency for Dow on a go-forward basis.  Further, as to digitization and knowledge management, the slides discussed elements that

"form a key part of our customer experience" as well as branding ideas, proposals and engagement opportunities.

46.    Maughon's slides then summarized what Dow needed "to sustain progress and meet targets" regarding growth synergies; provided suggestions to the P&SP GLT as to how investment could support process innovation and next generation process technologies; articulated several steps that Dow needed to take on the issue of sustainability and identified the "asks" that would "cultivate growth accelerators and drive focus on enablers."   Sustainability is a huge focus in the market because renewable plastics and recycle-ready plastics are viewed as imperative to offset public perception of plastics as environmentally unfriendly.

47.    Among the "back-up" slides supporting the presentation, Maughon included an integration update for R&D and Technical Services and Development ("TS&D") that provided regional status updates, on a worldwide basis, and a timeline that extended from June 2018 through the end of 2019.

48.    The back-up slides also discussed details, including flow charts, regarding the phases of Dow's "Next Gen Solution" regarding polymerization, as well as a slide discussing how that next generation solution "brings reliability, cost, and breakthrough process technology" and would advance Dow's competitiveness. The same slide discussed specifics about "project returns," needed capital expenditures, execution and technology risks, and opportunities to accelerate the

"cracker of the future platform."

49.     In two final slides of the presentation, Maughon identified: (1) a detailed methodology that would reduce Dow's capital intensity at a lower scale, as well as the resources needed and the likely capital needed in 2019 and 2020 for a demonstration of the project; and (2) another technology concept that would result in a "reduction in energy foot-print" and the monetary resources needed "for pilot module construction/testing" in 2020.   The slides refer to a revolutionary and pioneering project based on proprietary information that positions Dow as the most advantaged player in future projects.

50.     All of Maughon's slides were presented as the learnings and expectations as the outcome of Dow's "P&SP Innovation Summit."   Importantly, those slides formed just a part of the quarterly P&SP GLT meetings.   As a regular attendee and participant in those meetings, Maughon presented, provided input on, and learned highly confidential information in countless other operational, financial, and strategic respects that are directly competitive with SABIC, as discussed below.

51.     Maughon also attended Dow's "Strategy Week" meetings, which included highly proprietary, "Dow Restricted" detailed presentations about the P&SP business.   Strategy Week meetings also included financial summaries, discussions of progress updates on growth projects, "high-value core business" and the anticipated next phases of growth projects well into the future.   Some of those

presentations included growth and innovation plans extending out many years with Dow's various financial and other assumptions incorporated therein.  They included financial and value levers, key drivers and risks and critical issues; capital projects and timing; key projects to enhance Dow's world-class operations; the "strategic fit of potential targets" and the rationale for the potential acquisition; investor positioning and investment theses; targeted segments and anticipated growth percentages, market drivers, margins and challenges facing the company; key financial trends; and M&A pipeline candidate profiles.

52.     Some of the comparison data used during Strategy Week meetings included specific comparisons to SABIC and other direct competitors of Dow.

53.     Dow and SABIC compete in the production of olefin intermediates and olefin derivatives, especially polyethylene.  Maughon has extensive knowledge of Dow's products, processes, technologies and strategies that, absent an injunction, would provide SABIC with unfair competitive advantages.  Maughon's deep knowledge of Dow's technologies also plainly overlap with, and provide unfair competitive advantages to, SABIC's Polymers, Specialties and Chemicals business units.  Maughon also cannot truncate his exposure at Dow to these major segments, which account for the overwhelming majority of SABIC's business.  Indeed, Maughon has deep and proprietary knowledge of Dow's olefin production technologies, and a leadership position in defining and implementing Dow's product

732375344.4

and technology strategy, customer needs and associated market strategy.

54.     SABIC's sustainability strategy also is similar to Dow's in several material ways, such as commitments to innovations and sustainable solutions, energy and resource efficiency, circular economy, and corporate social responsibility.  Maughon had extensive involvement in sustainability while at Dow, including with respect to Dow's unique capabilities in the area of plastics sustainability efforts.  Maughon also had a key role in the development of P&SP's technology strategy regarding sustainability, including analyses of potential breakthrough technologies such as feedstock recycling, gasification and pyrolysis. All of this presents SABIC with the ability to leverage Maughon's expansive and proprietary knowledge of Dow's sustainability practices, particularly with respect to recent emerging strategies of Dow in plastics and hydrocarbons.

55.     Maughon also was privy to and had a direct role in strategy execution reviews, such as Dow's November 2018 confidential presentations on the "2019 Implementation Plan" for several business segments, including P&SP; the Feedstock and Energy Business; and the Olefins, Aromatics & Alternatives Business.  Those presentations addressed profit and loss data, accomplishments and key commercial arrangements, forecasts for future growth, updates on confidential projects, and anticipated future milestones.

56.     Importantly, Maughon was not a passive recipient of Dow's

confidential information that others disclosed to him.  To the contrary, he was actively and intimately involved in producing and developing proprietary information and strategies in many areas of Dow's business.  In his senior role within R&D, for example, Maughon was instrumental in setting Dow's strategies for which products to put into the company's pipeline (and, no less importantly, which products not to include because of factors such as cost considerations, time-to-market issues, operational hurdles, competitiveness challenges, and so forth).

57.     Maughon also was directly involved in and is extremely knowledgeable about, Dow's confidential data and benchmarking about personnel, compensation and benefits, employee pipelines, and recruiting and hiring strategies.

58.     One of Dow's important strategic methodologies is its integrated high throughput workflow process, which cost Dow billions of dollars and many years to develop.  This process extends from computer modeling of molecules through a series of steps that yields real-world testing and, ultimately, new products for customers.  Dow's proprietary, high throughput workflow process shortens, by several years, the time it takes to develop and bring products to market.  This is one example of Dow's distinct advantage over its competitors.  It also is an example of an area in which Maughon, especially in his senior R&D roles over the past decade, was deeply involved and poses a great competitive threat to Dow.

59.     Further, Maughon was well-versed and directly involved in Dow's

732375344.4

capital investment decisions, including decisions where Dow's strategy has changed over time with respect to geographic markets and products. Maughon's knowledge of those strategies and where Dow intends to move next provides SABIC with yet another competitive advantage.

60.     All of this information is highly confidential, and Dow maintains this confidentiality by having its employees (among others) sign agreements requiring strict confidentiality, as discussed below. This secrecy gives Dow and its customers significant competitive advantages over their respective competitors.

**E.     Dow's Business and Products**

61.     Dow is a multi-national materials science corporation that develops, manufactures, and sells plastics, as well as specialty chemicals and advanced materials, with applications in a wide range of industries, including but not limited to packaging, automotive, building and construction, industrial, healthcare, mass transportation, and consumer. Dow's market-driven, industry-leading portfolio of advanced materials, industrial intermediates, and plastics businesses deliver a broad range of differentiated technology-based products and solutions for customers in high-growth markets such as packaging, infrastructure, and consumer care.

62.     Plastics is Dow's largest business, representing over 40% of its annual revenue.

63.     Dow is also an industry leader in sustainability, which is a cornerstone

of modern materials science.  Dow's blueprints for a sustainable planet are aligned to the United Nations Sustainable Development Goals and are a collection of best practices and effective collaborations addressing the most pressing global challenges.  Dow is working on proprietary sustainable technologies and practices in areas such as plastic packaging, water, low carbon economy and workforce development that reflect Dow's experiences and collaborations to address these challenges.  Further, Dow is engaged in the transition from a linear economy to one that redesigns, recycles, reuses and remanufactures to keep materials at their highest value use for as long as possible.

64.    Dow's sustainability endeavors are not only good for the planet, but will provide a significant competitive advantage as customer demands continue to focus on sustainability issues, regulators continue to impose significant restrictions and limitations related to sustainability, and product performance and profitability otherwise continues to be increasingly driven by sustainability issues.  Indeed, Maughon's key role over the last several years in Dow's sustainability programs and his new title with SABIC as Chief Sustainability Officer highlights one of the many reasons why his non-compete agreement should be enforced.

F.    **SABIC's Business and Products Directly Compete with Dow**

65.    According to SABIC's website, SABIC is a public company based in Riyadh, Saudi Arabia.  SABIC states on its website that 70 percent of the company's

shares are owned by the Saudi Arabian Government, with the remaining 30 percent

traded publicly on the Saudi stock exchange.  https://www.sabic.com/en/about.

66.    SABIC, like Dow, is one of the world's largest chemical companies.

Although it is headquartered in Saudi Arabia, SABIC operates and does business

throughout the world.  "SABIC manufactures on a global scale in Saudi Arabia, the

Americas, Europe and Asia Pacific."   https://www.sabic.com/en/about/corporate-

profile/sabic-at-a-glance.  SABIC represents that it employs approximately 35,000

employees globally, and its operations span across 50 countries; SABIC also has

"five key geographies with innovation hubs: the Middle East, the USA, Europe,

South East Asia and North East Asia."  *Id.*

67.    SABIC also has substantial operations in the United States, including

through wholly-owned subsidiaries such as SABIC Americas, Inc., a Delaware

corporation that is headquartered in Houston, Texas, and SABIC Innovative Plastics

US LLC.  https://www.sabic.com/en/about/locations/sabic-manufacturing-affiliates.

SABIC Innovative Plastics US LLC has facilities throughout the United States,

including in Michigan, Texas and many other states, such as Alabama, California,

Florida, Indiana, Illinois, Massachusetts, Mississippi, New York, North Carolina,

Ohio, Pennsylvania and West Virginia.

68.    In terms of particular types of products, a company overview brochure

on SABIC's website states that SABIC makes "[c]hemicals, plastics, and other basic

732375344.4

materials, for everything from toys and cosmetics to aircraft components."
https://www.sabic.com/assets/en/Images/THIS_IS_SABIC_EN_2017_tcm1010-3222.pdf. SABIC touts its "immense R&D effort" that it claims help to bring "a steady stream of improvements that help our customers make the modern world better, faster, lighter, cheaper – and in ways that help protect the environment." *Id.*

69.     SABIC also asserts that it "ranks among the world's top petrochemical companies. The company is among the world's market leaders in the production of polyethylene, polypropylene and other advanced thermoplastics, glycols, methanol and fertilizers."     https://www.sabic.com/en/about/corporate-profile/sabic-at-a-glance. According to SABIC, it "is a market leader in key products such as ethylene, ethylene glycol, methanol, MTBE, polyethylene and engineering plastics and its derivatives." SABIC's website also notes that SABIC is "the world's largest producer of mono-ethylene glycol, MTBE, granular urea, polycarbonate, polyphenylene and polyether imide," and "the world's third largest producer of polyolefins." https://www.sabic.com/en/about/corporate-profile/Facts-Figures.

70.     Further, "[c]hemicals, SABIC's largest strategic business unit, accounts for     more     than     60%     of     the     company's     total     production."
https://www.sabic.com/en/about/corporate-profile/Facts-Figures.     And     among SABIC's various goals is "a vision to be the preferred world leader in chemicals."
https://www.sabic.com/en/about/our-vision.

71.     SABIC promotes itself as a market leader in multiple products and segments.  SABIC's largest operating unit is petrochemicals; SABIC manufactures a wide range of chemicals, plastics and other materials throughout the world. SABIC also asserts that it is a global leading fertilizer producer.  Further, SABIC represents that it has a broad portfolio of specialty compounds.  SABIC reports that it manufactures "[a]round 40,000 thermoplastic resins, specialty compounds, films, sheets, and additives that enable manufacturers in industries from automotive to electronics to healthcare do what they do better."  *Id.*  SABIC's website promotes its dozens of polymers, chemicals, specialty materials, agri-nutrients and metals. https://www.sabic.com/en/products.

72.     Dow and SABIC are direct competitors in multiple areas.  For example, according to a report by IHS Markit, SABIC and Dow are listed as 2019's top two chemical companies globally in terms of capacity to produce ethylene.  In his senior leadership roles within P&SP and R&D, Maughon knows intimately that Dow has been assessing and investigating dramatic changes in how ethylene is produced. Indeed, Maughon was intimately involved in what Dow plans to do in the future to reduce the environmental impact of propylene and ethylene.  Dow believes that the technology programs under development may revolutionize the industry and lead to a tremendous competitive advantage for Dow.  Maughon was directly involved in these programs at Dow and has tremendous knowledge about the work underway,

what development paths proved unsuccessful, and what limitations Dow must overcome going forward.  His employment with SABIC presents a tremendous competitive opportunity to SABIC, at Dow's direct expense, where they can short cut years of development and potentially billions of dollars in their efforts to compete with Dow.

73.    Moreover, Maughon has a deep understanding of the economics involved with Dow's polyethylene business, including Dow's profit margins. Importantly, Dow licenses ethylene oxide technology to SABIC, and Maughon's knowledge poses a significant commercial risk to Dow's business.  Specifically, whenever SABIC pays a license fee to Dow, Maughon knows exactly how much profit Dow will generate from that fee as well as what strategies SABIC might employ in obtaining a better deal, from Dow or others.  This knowledge provides SABIC with an enormous competitive advantage, including, for example, in future licensing negotiations.  And there is no way for Maughon to erase such knowledge from his head.

74.    Similarly, Polyolefins is another example of direct competition, and it is the largest part of Dow's current business.  Maughon both was in charge of R&D in that segment of the business and was on the board of Dow's wholly-owned subsidiary, Univation™ Technologies, the leading technology licensor to the polyethylene industry and manufactures and supplies catalysts used in polyethylene

production.  Catalyst technology is how Dow seeks to obtain competitive advantages by creating differentiated products in polyethylene, essentially transforming commodity chemicals into specialty product offerings.  In his senior R&D leadership role, Maughon was deeply immersed in Dow's underlying technologies, and, equally importantly, how to make those technologies better in the future.  Further, not only does SABIC compete with Dow in the polyolefins space, but SABIC is also a licensor of Univation™.  Consequently, Maughon's departure to SABIC presents significant competitive and commercial advantages to SABIC at Dow's direct expense.

75.    Further, in the area of hydrocarbons, Maughon was directly involved in Dow's Fluidized Catalytic Dehydrogenation ("FCDh") technology, which produces high value propylene from shale gas feedstocks in a more efficient and flexible way than present technologies.  Just as importantly, Maughon has in-depth knowledge of Dow's forthcoming breakthrough technology that builds off of the FCDh technology that Dow previously developed.   Dow's proprietary technology allows for the production of ethylene with substantially less capital and energy than is presently used, while significantly reducing carbon dioxide generation.  Maughon also knows how Dow is building its facilities for these technologies, and the costs and economics associated with them, both for Dow and its licensees.  All of this information can be used to SABIC's advantage.

31

732375344.4

76.    The 2019 IHS Markit report identifies many other areas in which SABIC and Dow compete.  For example, the report noted that SABIC and Dow both are in the top 9 companies globally with regard to high-density polyethylene resins, and the top 5 with regard to both low-density polyethylene resins and linear low-density polyethylene resins.  The report also notes that SABIC and Dow are in the top 4 companies globally with regard to ethylene oxide, and both companies are within the top 22 globally regarding ethanolamines.  And SABIC and Dow are ranked numbers 7 and 8, respectively, for companies globally regarding alpha olefins.  While the chemical names may not be familiar to those outside of the materials industry, the chemistries where Dow and SABIC compete are critical to modern life, enabling a diverse set of products that benefit the daily lives of consumers in a range of applications.

77.    Over the past decade, SABIC has taken steps to transform its business to become much more like Dow.  Through a series of events, including a number of acquisitions and joint ventures, SABIC's business has expanded in the past several years to become much more closely aligned with Dow's business, particularly in the area of plastics.  Indeed, SABIC's Vision 2025 is to become a global leader in chemicals through acquisitions, strategic partnerships such as joint ventures, and international expansion.

78.    For example, in 2013, SABIC opened a plastics application

32

development center, an engineering plastics compounding facility and new technology centers in multiple countries.

79.     SABIC's work with South Korean company SK Global Chemicals ("SK") illustrates the overlap in competition. In 2014, SABIC formed a joint venture with SK to produce high-performance polyethylene products in multiple countries. In 2015, SABIC and SK finalized another joint venture designed around SK's Nexlene™ polyethylene process in order to manufacture low-density polyethylene, plastomers and elastomers. As reported in Chemical & Engineering News, Volume 92, Issue 22, p. 14, "Nexlene™ is a combination of catalyst, process, and product technologies developed by SK Innovation. A single-site catalyst is used to manufacture polyolefin." Dow produces polyolefins with a highly similar process, for which subtle technical details known by Maughon dictate Dow's competitive advantage. The Nexlene™ process is further evidence that SABIC is trying to become much more like Dow, and Maughon's employment with SABIC poses a great threat in that regard. Dow's products, such as DOWLEX™, which is the industry standard for solution-phase polyethylene, and its developing product families are one to two generations ahead of Nexlene™. Because Maughon is directly familiar with Dow's products and future technologies and how they are differentiated from SABIC's products and technology, this information clearly demonstrates the competitive overlap between his roles at SABIC and Dow, and

highlights the harm Maughon will cause to Dow if he remains at SABIC.  Maughon cannot erase his proprietary knowledge of Dow's solution process and would provide SABIC with a significant advantage.

80.     SABIC also has looked to the United States to expand into the shale gas market, including through a joint venture with Exxon Mobil to build the world's largest ethylene plant in Texas.  That plant is expected to be operational in 2021 or 2022, and provides SABIC with competitive advantages in light of the shortage of ethane in Saudi Arabia.

81.     SABIC's own documents, such as its Investor Presentation for the third quarter of 2018, describe Dow as one of its direct competitors.  As reported in Dow Jones Institutional News on September 12, 2018, SABIC "is one of the largest petrochemicals firms globally, and matched with Aramco's current downstream operations, would create an integrated-energy and chemicals firm that competes with the likes of DowDuPont Inc., Germany's BASF SE and Exxon Mobil Corp."  Indeed, earlier this year, Saudi Aramco, the Kingdom-owned oil company in Saudi Arabia, announced the purchase of a 70% stake in SABIC.  This strategy further aligns SABIC's business model with that of Dow's, especially since Saudi Aramco is a customer of Univation™ and SABIC is a licensor of Univation™.

82.     Countless market and industry publications have recognized that Dow and SABIC are direct competitors.  For example, a July 12, 2017 Energy Intelligence

34

Group briefing entitled "Saudi Listing Poses Challenges for ARAMCO IPO" explained: "With a present market cap of around $80 billion, [SABIC] is one of the world's largest chemical makers, competing with the likes of the US' Dow Chemical and Germany's Bayer and BASF." Similarly, a Dun & Bradstreet One-Stop Report prepared in April 2019 includes a "Competitors Report" section that lists Dow as one of SABIC's competitors. This also is borne out by websites that discuss the competitors of each company: "SABIC's competitors include . . . Dow Chemical Company" (https://www.comparably.com/companies/sabic/competitors) as well as www.owler.com, where the "competitive analysis" section of that particular website states that "Dow has been one of SABIC's top competitors." https://www.owler.com/company/sabic.

83. A Dun & Bradstreet 2019 One-Stop Report identifies how similar SABIC is to Dow's business in several key respects, especially as they relate to Maughon's work for Dow: "SABIC stands for Saudi Basic Industries Corporation, but it could also stand for 'seriously, a big industrial company.' Saudi Arabia's largest non-oil company, SABIC operates through six units: chemicals, performance chemicals, polymers (polyolefins, PVC, and polyester), plastics (including SABIC Innovative Plastics), fertilizers, and metals (steel and aluminum). SABIC is one of the world's top makers of polyethylene and polypropylene. The company, which introduces some 150 new products per year, operates 60 manufacturing and

732375344.4

compounding plants in more than 40 countries, as well as numerous distribution centers, offices and storage facilities."

84.     The Dun & Bradstreet report goes on to identify a number of SABIC's strengths:  "SABIC is one of the world's market leaders in the production of polyethylene, polypropylene and advanced thermoplastics, glycols, methanol, and fertilizers.  It is also one of the largest producers of steel in the Middle East.  SABIC is third largest global diversified chemical company.  SABIC conducts its operations through a global network of over 60 manufacturing plants; and 21 technology centers in 50 countries across the world.  The company is among the leaders in glycol production."

85.     And, of course, any side-by-side comparison of Dow's and SABIC's business units clearly demonstrates that Dow and SABIC compete across numerous chemicals, products and market areas, including many of which Maughon was deeply involved with while at Dow.

## G.     Maughon's Departure From Dow

86.     On Friday, April 12, 2019, Maughon notified A.N. Sreeram, Dow's Senior Vice President of R&D and Chief Technology Officer, that he was resigning from Dow and that his last day of work would be April 18, 2019.  Maughon refused to inform Sreeram where he was going to work.  Dow later learned that Maughon was joining SABIC, one of Dow's primary competitors.

732375344.4

87.     Following Maughon's resignation, Dow tried to resolve this matter without the need for litigation.  For example, on April 24, 2019, Dow e-mailed and sent a letter and a copy of the Agreement to Maughon to remind him of his non-compete, confidentiality and post-employment obligations to Dow.  Among other things, Dow's letter explained that Maughon's position at SABIC "would involve multiple areas of technology and business in which you worked for Dow and in which you were exposed to Dow's confidential information" such that Maughon's employment with SABIC constituted a breach of the Agreement.  Accordingly, Dow's letter demanded that Maughon provide immediate written assurances that he would cease working for SABIC and that he would not work for SABIC until the expiration of the two-year period specified in the Agreement.

88.     On April 24, 2019, Dow also sent a copy of the letter to Maughon and his Agreement to SABIC's General Counsel and General Manager for People & Organization.

89.     On that same date, Dow e-mailed and sent a separate letter to the General Counsel of SABIC to notify SABIC of Maughon's post-employment obligations to Dow.  As in the letter to Maughon, Dow demanded that SABIC provide prompt written assurances that SABIC would end its employment of Maughon.

90.     On April 26, 2019, SABIC's General Counsel, Naveena Shastri,

732375344.4

responded by letter. In that letter, Shastri stated, among other things, that SABIC "disputes many of the factual and legal assertions in Dow's letter," including whether Maughon's non-compete agreement is enforceable. Shastri also asserted that Maughon's work for SABIC "does not implicate or jeopardize Dow's confidential information." Of course, Shastri did not, because she could not, dispute that SABIC and Dow are direct competitors or that Maughon's work at Dow involved a number of areas that present significant competitive issues because they directly overlap with SABIC's businesses. However, the letter did not identify any restrictions that SABIC was willing to place on Maughon's job duties, and further failed to acknowledge its obligations to preserve all relevant evidence. Moreover, Shastri's letter ignored the fact that the non-compete covenant is an independent provision of the Agreement and is actionable whether or not Maughon has disclosed or used confidential information.

91.     On April 29, 2019, Maughon's attorney, Sidd Rao, sent a similar letter, again failing to dispute the significant competitive overlap between Dow and SABIC or the significant competitive risk to Dow from Maughon's employment, but simply proclaimed that "[a] court will find Dow's agreement to be unreasonable and unenforceable."

**H.     Maughon's Employment with SABIC Violates His Agreements with Dow**

92.     On information and belief, on or about April 23, 2019, SABIC issued

732375344.4

an internal statement announcing that Maughon had accepted the position as SABIC's Executive Vice President of Technology, Innovation and Sustainability, and Chief Technology and Sustainability Officer.

93.     Maughon's role at SABIC is substantially similar to his recent roles with Dow.  As at Dow, Maughon will lead SABIC's plastics R&D, as well as its sustainability initiatives.  Maughon's role, as announced by SABIC, would involve Maughon making strategic decisions and having oversight in areas that require the use and/or disclosure of Dow's trade secrets and other proprietary information to SABIC's benefit and to Dow's detriment.  For exactly this reason and others, the Agreement prohibits Maughon from working in this role at SABIC for a period of two years after termination of his employment with Dow.

94.     Such a plain violation of Maughon's contractual obligations to Dow cannot be permitted.  Dow thus seeks preliminary and permanent injunctive relief: (i) forbidding Maughon from working for SABIC for the agreed-upon two-year period; (ii) requiring him to honor his other contractual obligations to Dow; and (iii) prohibiting him from disclosing or using Dow's trade secrets and confidential information in any fashion.

## COUNT I
## BREACH OF CONTRACT

95.     Dow incorporates each of the paragraphs above as if they were fully set forth herein.

732375344.4

96.     Maughon's Agreement with Dow is a valid, enforceable contract. Maughon was a highly-educated, sophisticated individual when he entered into the Agreement with Dow.  When he signed the Agreement, Maughon understood that doing so was a condition of joining Dow.  Maughon was competent and had the opportunity to read the Agreement and consult with others prior to agreeing to the terms in the contract.  Dow also provided Maughon with substantial consideration, such as (i) employment with Dow and numerous promotions, (ii) substantial compensation and other employee benefits, and (iii) access to Dow's confidential information, all in consideration of—and in reliance upon—his knowing and voluntary execution of the Agreement.

97.     Dow has performed all of its obligations under the Agreement by continuing to employ Maughon for 21 years and not breaching or violating any terms of the Agreement.

98.     Article 6 of the Agreement, which includes Maughon's covenant not to compete, is a covenant that operates independently of Article 2 of the Agreement, which contains restrictions on the use or disclosure of confidential information. Article 6 therefore applies whether or not Maughon uses or discloses Dow's confidential information.

99.     SABIC is a direct competitor of Dow and a "business which involves an area of technology or business in which [Maughon] worked for Dow during the

last five . . . years of [his] employment at Dow and in which [he] was exposed to . . . Confidential Information of Dow." Agreement, p. 2, Art. 6.   Article 6 of the Agreement accordingly forbids Maughon to work for SABIC for a period of two years following his resignation from Dow.  *See id.*

100.   Due to the significant overlap between his job at Dow and his job at SABIC, Maughon's acceptance of employment with SABIC constitutes a breach of the Agreement.

101.  Dow has substantial and legitimate interests in protecting its Confidential Information from use by competitors, in protecting its long-term customer relationships and in third party collaborations.  Dow has further substantial and legitimate interests in preventing key employees from using their knowledge, derived through employment at Dow, of critical technology, economics, business and other strategies to cause tremendous competitive harm to Dow through employment at a direct competitor.

102.  As a proximate result of Maughon's breaches and/or threatened breaches, Dow's trade secrets and other Confidential Information have been and will be compromised.  A further direct result of Maughon's breaches and continued employment at SABIC is tremendous and irreparable harm to Dow due to the expansive competitive harm his knowledge will enable SABIC to inflict upon Dow.

103.   Dow has no adequate remedy at law with respect to the Agreement

732375344.4

because Maughon's violations of the Agreement are continuing and will continue until and unless they are enjoined, and monetary damages are difficult to quantify and, in any event, will not make Dow whole.

104.   In addition, the SOA and RSUA are valid and enforceable contracts.

105.   When he entered into the SOA and RSUA with Dow, Maughon understood that doing so was a condition of accepting and receiving the substantial stock options and restricted stock units that he received.  Maughon reaffirmed that understanding in each of the years in which he received such options and restricted stock units.

106.   Dow performed all of its obligations under the SOA and RSUA.

107.   Maughon breached the SOA and RSUA by voluntarily resigning his employment to join SABIC, one of Dow's direct competitors.

108.   Consequently, Dow is entitled to recover monetary damages from Maughon pursuant to the provisions of the SOA and RSUA.

**COUNT II**
**MICHIGAN UNIFORM TRADE SECRETS ACT**

109.   Dow incorporates each of the paragraphs above as if they were fully set forth herein.

110.   The Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws §§ 445.1901 *et seq.*, provides a statutory cause of action and remedies for a former employee's actual or threatened misappropriation of a trade secret.

732375344.4

111.   An injunction is one of the remedies specifically authorized by Section 3 of the MUTSA.

112.   During his employment with Dow, Maughon had access to, obtained and received trade secrets and other highly confidential and proprietary information.

113.   Dow takes substantial measures to protect such information, including, without limitation, by requiring employees like Maughon, as a condition of joining the company, to enter into written employment agreements with strict confidentiality and non-disclosure provisions.

114.   Maughon was privy to many of Dow's most sensitive and protected trade secrets, including its strategies, analyses and plans regarding R&D, sustainability, product and process development, emerging technologies, pricing, profit margins, growth strategies, strategic markets, product development, and competitive intelligence.

115.   In addition to requiring employees to sign confidentiality provisions, Dow takes a variety of other steps, such as providing written guidelines about the types of protection for confidential information, to closely guard its trade secrets. Dow also shares those secrets only with those employees, such as Maughon, who have a need to know them.

116.   Given the substantial, material overlap in duties and responsibilities that Maughon performed at Dow and would perform for SABIC as its Executive

Vice President of Technology, Innovation and Sustainability, and Chief Technology and Sustainability Officer, an injunction is necessary to protect Dow from the actual and/or threatened use of its trade secrets.

## PRAYER FOR RELIEF

Dow does not seek to preclude Maughon from being employed in his chosen field. There are countless places where Maughon could work that are not direct competitors of Dow in the same way that SABIC is. Dow seeks only relief that will (i) enforce its contractual and other rights for the two-year period following entry of the injunction, (ii) enforce its contractual and property rights to prevent the use or disclosure of its confidential and proprietary information, and (iii) prevent Dow from incurring any further damages.

WHEREFORE, Dow requests that:

A.     The Court issue a preliminary injunction restraining and enjoining Maughon, until further order of the Court,

     i.     from directly or indirectly remaining employed, or becoming employed, by SABIC for a period of two (2) years following entry of the injunction, in a capacity similar to the capacity in which he worked for Dow and/or in any capacity in which he will disclose or use Dow's Confidential Information and trade secrets, specifically including that he may not work in his present position of Executive Vice President of Technology, Innovation and Sustainability, and Chief Technology and Sustainability Officer;

     ii.     from directly or indirectly misappropriating, attempting to misappropriate, using, attempting to use, disclosing, or

      attempting to disclose Dow's Confidential Information and trade secrets; and

    iii.    from interfering, in any way, with any current contractual or prospective client relationship of Dow; and

B.    After trial in this action, the Court issue a permanent injunction to the same effect as the preliminary injunction requested above; and

C.    The Court award Dow monetary damages, interest, attorneys' fees and costs and any other relief to which Dow may be entitled.

Respectfully submitted,

THE DOW CHEMICAL COMPANY

Dated:  May 7, 2019

By:  /s/ Michael A. Olsen
Michael A. Olsen
Andrew S. Rosenman (P54869)
Brett E. Legner
Peter B. Baumhart
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Phone:  (312) 782-0600
Facsimile:  (312) 701-7711
molsen@mayerbrown.com
arosenman@mayerbrown.com
blegner@mayerbrown.com
pbaumhart@mayerbrown.com

and

Edward J. Bardelli (P53849)
Warner Norcross + Judd LLP
900 Fifth Third Center

732375344.4

111 Lyon St., N.W.
Grand Rapids, MI 49503-2487
Phone:  (616) 752-2000
Facsimile:  (616) 752-2500
ebardelli@wnj.com

732375344.4

## **VERIFICATION**

I, A.N. Sreeram, am employed by The Dow Chemical Company as Senior Vice President of Research & Development and Chief Technology Officer. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on May 7, 2019.

_____
A.N. Sreeram

47

732375344.4